1

2

3

4

5

6

7

8

9                    IN THE UNITED STATES DISTRICT COURT

10                      FOR THE DISTRICT OF OREGON

11  LISA PATTON,                    )
                                    )
12                  Plaintiff,      )
                                    )      No.  CV-09-682-HU
13        v.                        )
                                    )
14  MICHAEL J. ASTRUE,              )
    Commissioner of Social          )      FINDINGS & RECOMMENDATION
15  Security,                       )
                                    )
16                  Defendant.      )
    ────────────────────────────────)
17
    Tim Wilborn
18  WILBORN LAW OFFICE, P.C.
    P.O. Box 2768
19  Oregon City, Oregon 97045

20        Attorney for Plaintiff

21  Dwight C. Holton
    ACTING UNITED STATES ATTORNEY
22  District of Oregon
    Adrian L. Brown
23  ASSISTANT UNITED STATES ATTORNEY
    1000 S.W. Third Avenue, Suite 600
24  Portland, Oregon 97204-2902

25  / / /

26  / / /

27  / / /

28  / / /

1 - FINDINGS & RECOMMENDATION

Benjamin J. Groebner
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Office of the General Counsel
Social Security Administration
701 5th Avenue, Suite 2900, M/S 901
Seattle, Washington 98104-7075

    Attorneys for Defendant

HUBEL, Magistrate Judge:

    Plaintiff Lisa Patton brings this action for judicial review of the Commissioner's final decision to deny disability insurance benefits (DIB) and supplemental security income (SSI). This Court has jurisdiction under 42 U.S.C. § 405(g) (incorporated by 42 U.S.C. § 1383(c)(3)). I recommend that the Commissioner's decision be reversed and remanded for further proceedings.

PROCEDURAL BACKGROUND

    Plaintiff applied for DIB and SSI on June 30, 2006, alleging an onset date of April 16, 2005. Tr. 33, 109-16 (applications showing alleged onset date of October 31, 2003, but hearing testimony clarifying that alleged onset date should be April 16, 2005). Her application was denied initially and on reconsideration. Tr. 79-88, 90-95.

    On April 17, 2008, plaintiff, represented by counsel, appeared for a hearing before an Administrative Law Judge (ALJ). Tr. 30-74. On June 20, 2008, the ALJ found plaintiff not disabled. Tr. 9-21. The Appeals Council denied plaintiff's request for review of the ALJ's decision. Tr. 1-5.

FACTUAL BACKGROUND

    Plaintiff alleges disability based on a brain injury and hearing loss. Tr. 125. At the time of the April 17, 2008 hearing, plaintiff was forty-two years old. Tr. 109, 114. Plaintiff has

2 - FINDINGS & RECOMMENDATION

completed one year of college.  Tr. 131.  Plaintiff's past relevant work is as a general office clerk.  Tr. 19.

I.  Medical Evidence

Despite an onset date of April 16, 2005, the conditions plaintiff alleges are disabling are alleged to have been caused by a fall on October 31, 2003.  However, there are no records before this Court, nor were there any before the ALJ or the Appeals Council, from the date of the fall at which time plaintiff contends she (1) lost consciousness; (2) bled, perhaps from her ears, or had a perforated ear drum; (3) went to the emergency room; (4) had a CT scan of her head; and (5) received stitches.  Tr. 279 (plaintiff's report to ear, nose, and throat specialist Dr. Daniel Fear at time of hearing test on December 6, 2005, indicating at the time of the injury, she had "some bleeding); Tr. 504-05 (November 18, 2003 medical history record from Siskiyou Community Health Center in Grants Pass with self-report of concussion, stitches, and perforated ear drum on October 31, 2003); Tr. 508 (December 30, 2003 report from Dr. Michael Villanueva to Dr. Jon Tippin which includes a history from plaintiff of her October 31, 2003 injury in which she reports that she went to the Three Rivers Community Hospital emergency department after falling, striking her head, losing consciousness, lacerating her chin, and cutting her leg; also refers to having had a normal CT head scan at the emergency department).

On December 30, 2003, Dr. Michael R. Villanueva, Psy. D., a clinical psychologist, performed a neuropsychological evaluation of plaintiff.  Tr. 508-11.  Dr. Villanueva referred to plaintiff's October 31, 2003 closed head injury.  Tr. 508.  According to Dr.

3 - FINDINGS & RECOMMENDATION

1  Villanueva, the records about the incident reported that plaintiff
2  was videotaping a football game when she caught her leg, tripped,
3  and apparently fell forward, striking the right side of her head
4  and chin, and losing consciousness.  Id.  She felt stunned and
5  lacerated her chin.  Id.  Although a CT scan of her head was
6  normal, plaintiff complained of headaches, neck pain, emotional
7  lability, problems concentrating, and dizziness.  Id.

8      At the interview with Dr. Villanueva, plaintiff complained of
9  memory problems.  Id.  She did fairly well on some days, but on
10 other days felt lost or could not find her keys.  Id.  She
11 sometimes spent time looking for something which was already in her
12 hands.  Id.  The symptoms were making her nervous, and the stress
13 was provoking a rash.  Id.  She also described experiencing daily
14 headaches.  Id.  Plaintiff remarked that her sense of taste was
15 affected by the injury, her mood remained depressed, she was
16 tearful, and she was not sleeping well.  Tr. 508-09.

17     As for her activities of daily living, plaintiff told Dr.
18 Villanueva that she was working for an accountant and was taking a
19 tax preparation class.  Id.  Her grades in the class had generally
20 gone down since the injury, although she had received a few good
21 grades as well.  Id.  At the time, she was working three days per
22 week, six hours per day, but indicated that her hours were to
23 increase as tax season approached.  Id.  She also was the
24 chairperson for a fundraiser for her childrens' school, and worked
25 with a women's crisis center.  Id.  She had recently gotten married
26 and lived with her new husband and her three children.  Id.

27     Dr. Villanueva noted that plaintiff was able to follow the
28 context of the interview without difficulty.  He further noted that

4 - FINDINGS & RECOMMENDATION

plaintiff reported persistent cognitive difficulties following her head injury.  Tr. 510.  He opined that her symptoms may be explained as post-concussive syndrome given the impact to her head, or they might be because of emotional factors that could be "closely intertwined" with response to stress.  Id.  He suggested she return for standardized testing, which she did on March 9 and 14, 2004.  Tr. 510-12.

During testing, plaintiff's affect was "constricted," and she was tearful at times.  Id.  Dr. Villanueva's impressions were that plaintiff had a pain disorder with medical and psychological features, and that she had depression with anxious features.  Tr. 514.  In his discussion, he stated that her examination was "most significant for considerable psychological distress."  Id.  During an arithmetic portion of the testing, plaintiff reported she was breaking out in hives due to "stress," but she declined a break.  Tr. 512.

Dr. Villanueva opined that it was "likely that low points on the cognitive exam, as well as subjective cognitive difficulties, were secondary to psychological distress."  Tr. 514.  He found no evidence of memory or language dysfunction.  Id.  He did find evidence of a tendency to over-focus on physical symptoms/concerns and depression.  Tr. 513.  He recommended additional antidepressant medication and counseling.  Tr. 514.

Plaintiff saw Dr. Villanueva twice in April 2004.  Tr. 515, 516.  At that time, she was taking several medications including an anti-anxiety medication started approximately six weeks prior to April 6, 2004, as well as three antidepressant and/or anti-anxiety medications, two of which she had started two weeks prior to April

5 - FINDINGS & RECOMMENDATION

6, 2004.  Tr. 515.  There is nothing in the record indicating who or how many medical providers prescribed these medications.

Dr. Villanueva noted that plaintiff's case was complicated by anxiety and depression.  Id.  Her new husband had left her and she had been suffering from out-of-control hives.  Id.  There is also a reference to biofeedback training for plaintiff at age eighteen to control pain.  No details are available.  Tr. 515.

Dr. Villanueva suggested a comprehensive approach for rehabilitation, including mnemonic strategies, behavioral strategies, and medical strategies to reduce anxiety and depression.  Id.  He initiated mnemonic strategies, including a memory book.  Id.  On April 27, 2004, Dr. Villanueva saw plaintiff again and noted that she appeared less anxious.  Tr. 516. Plaintiff reported having decreased a couple of her medications, improvement with her hives, and increased activity.  Id.  She still had problems with sleep.  Id.

Plaintiff reported having been reduced to two hours at her job.  Id.  She stated that her employer told her there was concern she was making errors, although plaintiff herself thought she was improving.  Id.  Although Dr. Villanueva stated that he was to see her again in three weeks, there are no additional records from him in the Administrative Record.

During the time plaintiff was seeing Dr. Villanueva, she was a patient of chiropractor Dr. Thomas Gilliland, D.C..  In fact, she had one visit with Dr. Gilliland before her injury on October 31, 2003.  Tr. 249.  On approximately September 18, 2003, she complained of a headache, something to do with a rib, and a kidney infection.  Id.  After her October 31, 2003 injury, Dr. Gilliland's

6 - FINDINGS & RECOMMENDATION

chart notes show that plaintiff saw him one to four times per month from January 14, 2004, through April 2004. Tr. 243-49 (showing examination dates of January 12, 2004, January 14, 2004, February 11, 2004, March 3, 2004, March 17, 2004, March 18, 2004, March 22, 2004, and April 2, 2004). Most of his handwritten chart notes are illegible or without meaning because of his use of unexplained abbreviations, although there is the occasional legible reference to "HA" which I interpret to mean headaches. Id. Other abbreviations include "NP," "MT," and "T." Tr. 243-49. There is also a note, on the January 12, 2004 entry, to an October 31, 2003 "trip & fall." Id.

There is a typewritten chart note for April 2, 2004. Tr. 247. There, Dr. Gilliland remarked on plaintiff's complaints of headache, neck pain, upper back pain, and lower back pain. Id. She also reported having hives. Id. Dr. Gilliland performed manipulative treatment of plaintiff's back, as well as "manual traction." Id. He noted that plaintiff felt better following the treatment, although she was very sore. Id.

On June 28, 2004, plaintiff saw Physician's Assistant Scott Swindells at the Siskiyou Community Health Center. Tr. 337. As part of her reported medical history, plaintiff noted that she had previously been in an abusive relationship with a former husband who at one time had beaten her so badly he caused a brain hemorrhage. Tr. 337. She noted that her current husband had left her, even though they had been married only in 2003, because she was so different following her October 31, 2003 head injury. Id. She noted that while the neuropsychological testing she received did not show any particular problem, she still had problems with

7 - FINDINGS & RECOMMENDATION

her memory.  Id.  She reported that her children thought she was different, she could not recognize people she knew, she could not handle her checkbook, and she had forgotten to pay at least her Oregon Health Plan bill on one occasion.  Id.  She reported that her work hours had been cut back to twelve per week because she was "messing up" on the job.[1]  Id.  She thought her memory was better than during the first month after her injury, but it was still not back to normal.  Id.

She also complained of the repeated hives which started after the injury.  Id.  Curiously, there is no indication that she complained of headache, neck pain, back pain, or rib pain.  PA Swindells diagnosed plaintiff as suffering from depression, status post concussion.  Id.  He also noted her troubles with memory.  Id.  He prescribed a different antidepressant medication.  Id.  He expected her to gradually get better from the injury and for her memory to gradually improve, although he noted he could not be sure.

After a six-month absence from chiropractic treatment, plaintiff saw Dr. Gilliland again on October 4, 2004, and saw him approximately twenty-six times from October 4, 2004, until January 27, 2005.  Tr. 215-46.  Plaintiff received repeated treatments of massage therapy, manual traction, and manual manipulation of various parts of her back to address her complaints of headache,

---

[1]  As noted above, Dr. Villanueva indicated in April 2004 that plaintiff's hours at work had been reduced to "two."  His note does not make clear if the reduction was to two hours per day or per week.  Either way, it is inconsistent with plaintiff's statement to PA Swindells that she had been reduced to twelve hours per week.

neck pain, and mid-back pain.  E.g., Tr. 246 (Oct. 4, 2004), Tr. 245 (Oct. 6, 2004), Tr. 244 (Oct. 11, 2004), Tr. 235 (Oct. 29, 2004), Tr. 231 (Nov. 2, 2004), Tr. 226 (Dec. 6, 2004), Tr. 224 (Dec. 13, 2004), Tr. 220 (Dec. 21, 2004).

During this time, Dr. Gilliland reported, on a couple of occasions, that plaintiff noted some improvement in her pain. E.g., Tr. 238 (Oct. 22, 2004:  plaintiff still feels tight and sore, but she noted improvement), Tr. 237 (Oct. 26, 2004: plaintiff's neck pain attributed to whiplash/head injury from prior year and needed extended massage treatment with a myofascial release in the cervical spine; such treatment administered on this date and plaintiff felt better), Tr. 233 (Nov. 1, 2004: plaintiff reported feeling better than her last treatment although she continued with headache, neck pain, upper back pain, and lower back pain; plaintiff felt much better to palpation).

At other times, Dr. Gilliland suggested that plaintiff's pain had worsened.  E.g., Tr. 244 (Oct. 11, 2004:  plaintiff crying because of the pain), Tr. 240 (Oct. 20, 2004: plaintiff complained of neck pain radiating to both arms and showed a limited range of motion), Tr. 229 (Nov. 3, 2004:  plaintiff sleeping on frozen peas because of pain and showed very poor range of motion with swelling in the cervical spine), Tr. 228 (Nov. 8, 2004:  neck pain causing extremely bad headache).

At her last visit with Dr. Gilliland, on January 27, 2005, he continued to note her neck, upper back, and low back pain.  Tr. 216.  She continued to receive manual traction and manual manipulation of various joints.  Id.  Dr. Gilliland noted that plaintiff's back muscles were still in spasm.  Id.

9 - FINDINGS & RECOMMENDATION

In a July 13, 2006 letter written by Dr. Gilliland to Disability Determination Services (DDS), regarding Dr. Gilliland's treatment of plaintiff and his opinion of her status, Dr. Gilliland noted plaintiff's fall and its resulting whiplash and loss of cervical lordosis or curvature for which she underwent treatment with him.   Tr. 276-77.   He remarked on her symptoms of severe headaches, dizzy spells, blurry vision, and impact on her ability to function.   Id.   He noted that the headaches and dizziness could, depending on how she felt at the time, impact her ability to sit, stand, walk, lift, carry, and handle objects.   Id.   He further remarked that the headaches affected plaintiff's ability to think clearly.   Id.   He commented that her employability and ability to hold a job would be limited because she would miss work at times. Id.   He also remarked that although she was pleasant and interacted socially very well, she sometimes needed to "pull back" and required quiet and peace to deal with her pain.   Id.

On or about February 10, 2005, plaintiff was apparently referred by a Dr. David Frank, D.O., for an esophagogastroduodenoscopy, an outpatient surgical procedure, for evaluation of epigastric pain.   Tr. 213.   However, other than a single reference by Dr. Gilliland on October 6, 2004 stating that plaintiff had thrown up in the last couple of days, there are no records showing that she had complained of any gastrointestinal problems in the months preceding this referral.   Tr. 245.   The procedure, performed February 17, 2005, showed mild antral gastritis, and an incompetent lower esophageal sphincter.   Tr. 212. The recommendation was to avoid caffeinated products.   Id.

On April 25, 2005, plaintiff went to the emergency department

10 - FINDINGS & RECOMMENDATION

1  at Three Rivers Community Hospital complaining of flank pain,
2  bladder pain, and pain while urinating.  Tr. 252-53.  She was
3  evaluated for a possible kidney stone or ectopic pregnancy, but was
4  finally diagnosed with an acute urinary tract infection with severe
5  flank and abdominal pain.  Id.  She had no kidney stone.  Id.  She
6  was given an antibiotic and a pain reliever.  Id.

7       About a week later, on May 2, 2005, plaintiff returned to see
8  PA Swindells at Siskiyou Community Health Center to follow up on
9  her emergency room visit, and to discuss her ongoing memory
10 problems.  Tr. 335.  Plaintiff told PA Swindells that the CT scan
11 from the prior week had confirmed the presence of kidney stone and
12 that she had received a Toradol injection to make it easier to pass
13 the stone.  Id.  PA Swindells noted in the chart that the emergency
14 department report showed no signs of kidney stones.  Id.  Plaintiff
15 had forgotten to take all of her antibiotic that was prescribed by
16 the emergency department because of her memory problems.  Id.  She
17 reported that she had lost all of her jobs and she cried at times
18 about her situation.  Id.  There is no indication she complained of
19 headache, neck pain, or back pain.

20      PA Swindells discussed various coping strategies with
21 plaintiff and suggested she try an "ADD drug" to see if that
22 helped.  Id.  He noted that once she qualified for the Oregon
23 Health Plan, he would send her to a neurologist or
24 neuropsychologist for an evaluation.  Id.  He also encouraged her
25 to apply for disability.  Id.

26      Six months later, plaintiff returned to see PA Swindells on
27 November 21, 2005.  Tr. 332.  She complained of her continued
28 memory problems and headaches, for which she reported taking

11 - FINDINGS & RECOMMENDATION

1  medication at least two to three times per week.  Id.  She also

2  indicated that the headaches were so bad they caused her to break

3  out in hives, although previously she had complained to Dr.

4  Villanueva that the hives were caused by stress.  Id.

5     Plaintiff indicated that she could not maintain a bank account

6  on her own and that her bank suggested she obtain a

7  conservatorship.  Id.  PA Swindells thought that her headache was

8  a "rebound" headache and he prescribed Depakote, a drug used to

9  treat seizures and migraine headaches.  Id.  He also advised

10 stopping all pain medication which meant that her headaches would

11 not improve for at least two to three weeks.  Id.

12    Plaintiff also told PA Swindells that she had been evaluated

13 by Dr. Villanueva, but she did not get along with him.  Id.  She

14 told PA Swindells that her lawyer wanted her to get another

15 evaluation from another provider.  Id.

16    On December 6, 2005, Dr. Daniel Fear, M.D., an ear, nose, and

17 throat specialist, evaluated plaintiff's hearing and found mild-

18 right-sided hearing loss.  Tr. 279 (July 14, 2006 letter from Dr.

19 Fear reporting earlier results).  Plaintiff reported to Dr. Fear

20 that she had "some bleeding" at the time of her fall in October

21 2003.  Id.

22    On January 18, 2006, PA Swindells noted that plaintiff had

23 lost the Depakote prescription.  Tr. 329.  He prescribed it again.

24 Tr. 323.  He also prescribed an anti-anxiety medication to help

25 with her hives.  Id.  He noted that she had a January 24, 2006

26 appointment with psychologist Katherine Greene.  Id.

27    On February 3, 2006, plaintiff went to the Siskiyou Community

28 Health Center complaining of left flank pain.  Tr. 328.  On

12 - FINDINGS & RECOMMENDATION

February 10, 2006, she had abdominal x-rays and a transvaginal ultrasound. Tr. 342, 343, 350, 351. These tests showed follicular cysts of the right ovary and multiple nabothian cysts of the cervix.[2] Id. Visualization of the left ovary was not obtained. Id.

Plaintiff returned to the Siskiyou Community Health Center on February 24, 2006, to follow up on a cough and continued flank pain. Tr. 324. Her lungs were positive for wheezes and an ovarian cyst was suspected. Id. She received a bronchodilator and a corticosteroid asthma medication. Id.

Clinical psychologist Dr. Katherine Greene, Psy. D., performed a neuropsychological evaluation on plaintiff over three separate dates in January, February, and March 2006. Tr. 265-73. Dr. Greene conducted clinical interviews with plaintiff, plaintiff's daughter, and plaintiff's current boyfriend. Tr. 265. Dr. Greene also administered thirteen separate psychological tests. Id. There is no indication in Dr. Greene's report that she reviewed any existing records or reports.

Dr. Greene wrote a six-page report, detailing the reason for the evaluation, her preliminary observations, plaintiff's psychosocial history (including plaintiff's medical history, family history, education, work history, activities of daily living, and social and family relationships), test results, summary and

---

[2] A nabothian cyst is a "retention" cyst formed by the nabothian glands at the neck of the uterus. Taber's Cyclopedic Medical Dictionary 931 (Clayton Thomas ed., F.A. Davis, 14th ed. 1981). A "retention cyst" is a cyst caused by retention of a secretion in a gland, due to closure of the gland's duct. Id. at 1243. A follicular cyst is one arising from a follicle. Id. at 360.

13 - FINDINGS & RECOMMENDATION

conclusions, recommendations, and her diagnostic impressions. Tr. 265-71. In her summary, Dr. Greene noted that test results indicated a number of deficits in plaintiff's cognitive abilities. Tr. 270. Dr. Greene concluded that the onset of plaintiff's disabilities, along with her strong history of school, work, and active involvement as a parent, indicated that plaintiff's deficits were as a result of her head injury in October 2003, and that there was a "major decline from premorbid functioning." Id. Dr. Greene stated that plaintiff was "clearly struggling" in the areas of attention, memory, and a broad range of information processing skills, "to a point where it is [a]ffecting social, school, employment and general day-to-day activities." Id.

Dr. Greene listed the results of the evaluation as follows: (1) intellectual functioning was in the average range; (2) reading, spelling, and math skills were within normal limits; (3) moderate deficits in language; (4) severe impairment in memory (verbal – severe; visual - moderate); (5) visual perception moderately impaired; (6) visual-motor integration moderately impaired; (7) attention and executive functioning moderately to severely impaired; (8) marked levels of clinical depression and anxiety; and (10) sensory complaints in vision (blurry, shadow spots), and hearing problems. Id. There is no explanation for why Dr. Greene found a severe memory impairment when two years earlier, and five months post-injury, Dr. Villanueva found none.

In more detail, Dr. Greene noted that plaintiff's attention problems showed up in poor concentration, heightened distractibility, and difficulty doing more than one thing at a time. Id. Plaintiff's memory problems consisted of problems in

14 - FINDINGS & RECOMMENDATION

the acquisition and retrieval of information. <u>Id.</u> She is "forgetful in all areas of her day-to-day living." <u>Id.</u> Plaintiff exhibited a slow recall of words, impaired fluency, and occasional paraphasia or misnaming. Tr. 271. Test results also showed visual and fine motor impairments. <u>Id.</u> Dr. Greene explained that plaintiff was "using as much of her coping skills as she can to perform as she once did, however, she is failing at work and in school[3] and is not functioning even in her basic day to day activities." <u>Id.</u>

Dr. Greene recommended that plaintiff reduce her attempts at multitasking. <u>Id.</u> She believed that plaintiff could use assistance and follow-up by a caseworker to assure that she was following through with things. <u>Id.</u> Dr. Greene noted that medication might be helpful to reduce anxiety and depressive symptoms. <u>Id.</u> Dr. Greene also recommended that plaintiff apply for disability services. <u>Id.</u>

Finally, in the section for diagnostic impressions, Dr. Greene concluded that plaintiff's Axis I diagnosis was dementia due to head trauma, and anxiety disorder NOS which Dr. Greene noted was mixed anxiety and depression. <u>Id.</u> She assessed plaintiff's Global Assessment of Functioning (GAF) score as 55, which she expressly noted was "failing at work and school." <u>Id.</u>

On May 17, 2006, plaintiff became a patient at Options for

_____

[3] During the time she was being examined by Dr. Greene, plaintiff was apparently attempting to take a class at Rogue Community College. Tr. 267. As reported to Dr. Greene by plaintiff, after her head injury, plaintiff went to the college to work on an accounting degree, but found she had lost a lot of her skills and had to retake a basic math class with which she was struggling. <u>Id.</u>

15 - FINDINGS & RECOMMENDATION

1   Southern Oregon Mental Health (formerly Jackson County Mental
2   Health).   Tr. 368.   Plaintiff reported symptoms of mood swings,
3   crying, depression, and difficulty organizing and focusing.   Id.
4   She noted that she functioned well until October 2003 when she
5   sustained her head injury, although she also related a past history
6   of significant physical and emotional trauma.   Id.   The agency's
7   records indicated that she had previous "crisis contacts" with the
8   agency in 1998, 1999, 2001, and 2002, the latter two for domestic
9   problems.   Id.   In the history section of the May 17, 2006 record,
10  plaintiff related a history of two marriages in which she was the
11  victim of physical abuse.   Id.

12      As assessed by Jacqui Davis, M.S., plaintiff was suffering
13  from post-traumatic stress disorder (which Davis indicated was
14  based on prior, unspecified treatment records and her history of
15  being a domestic violence victim), adjustment disorder, cognitive
16  disorder NOS, and had a GAF score of 50 on June 5, 2006.   Tr. 370.
17  Plaintiff's goals for treatment with Options Mental Health were to
18  learn how to adjust to her circumstances with her brain injury.
19  Id. Davis noted that because plaintiff's cognitive abilities were
20  significantly impaired, it was difficult to say how well plaintiff
21  would be able to do therapy.   Id.   Davis believed it would benefit
22  plaintiff to get a referral to "HASL" and intensive case management
23  through Options Mental Health to assist with her daily functioning.
24  Id.

25      On July 7, 2006, plaintiff saw Family Nurse Practitioner Kelly
26  Clayton at the Siskiyou Community Health Center for depression,
27  feeling tired, and left lower quadrant pain.   Tr. 317.   She
28  reported some episodes of vomiting with blood and blood in her

16 - FINDINGS & RECOMMENDATION

stool.  Id.  Plaintiff was in no apparent distress at the time of
the exam.  Id.  Clayton gave plaintiff Hemoccult cards to take
home, and indicated she would schedule plaintiff for an upper GI
and colonoscopy.  Id.

On July 21, 2006, plaintiff saw Dr. Linford Beachy, M.D., at
Siskiyou Community Health Center, to follow up on test results for
her continued flank pain.  Tr. 314.  She learned that her upper GI
study showed only mild spontaneous reflux.  Id.  Dr. Beachy
diagnosed gastroesophageal reflux disease and prescribed over-the-
counter Prilosec.  Id.

On August 8, 2006, DDS physician Dr. Martin Kehrli, M.D.,
completed a physical residual capacity assessment of plaintiff.
Tr. 280-87.  He found she could occasionally lift fifty pounds,
frequently lift twenty-five pounds, stand and/or walk for a total
of about six hours in an eight-hour workday, and sit for a total of
about six hours in an eight-hour workday.  Tr. 281.  She had
unlimited ability to push and/or pull, and no postural,
manipulative, visual, or communicative limitations.  Tr. 281-84.
Additionally, he found that plaintiff should avoid concentrated
exposure to hazards such as machinery, heights, etc.  Tr. 284.

The next day, August 9, 2006, Paul Rethinger, Ph.D., of the
DDS, completed a psychiatric review technique form, and a mental
residual functional capacity assessment of plaintiff.  Tr. 288-305.
He concluded that plaintiff had medically determinable impairments
of dementia due to a head injury, and anxiety disorder NOS.  Tr.
289, 293.  He found mild restrictions in activities of daily
living, and moderate restrictions in maintaining social functioning
and maintaining concentration, persistence or pace.  Tr. 298.  He

17 - FINDINGS & RECOMMENDATION

also found moderate restrictions in the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, and the ability to interact appropriately with the general public.  Tr. 302-03.  He indicated that plaintiff was capable of performing simple, repetitive tasks, and was limited to minimal general public contact.  Tr. 304.

On September 11, 2006, Pamela Rivera, a Psychiatric Mental Health Nurse Practitioner with Options Mental Health, performed a psychiatric evaluation of plaintiff.  Tr. 352-53.  Rivera stated that plaintiff met the criteria for a depressed mood disturbance due to a general medical condition, meaning her head injury.  Tr. 355.  She noted that plaintiff's mood disturbance occurred for most of the day, more days than not.  Id.  Rivera further noted plaintiff significant memory impairment and that plaintiff experienced a lot of anxiety over the past three years.  Id.  A "MMSE" (mini-mental state examination) test conducted by Rivera showed "true cognitive impairment," including difficulty with orientation, attention/calculation, and with memory recall.  Tr. 356.

Rivera's Axis I diagnoses were mood disorder due to head trauma with depressive features, dementia due to head trauma, anxiety disorder due to head trauma with generalized anxiety, and a provisional diagnosis of dysthymic disorder.  Tr. 356.  She assessed plaintiff's GAF score as 45.  Id.

Rivera noted that plaintiff was currently taking an antidepressant and prescription medication for migraine headaches, both prescribed by plaintiff's primary care provider.  Id.  Rivera started plaintiff on Aricept, commonly prescribed for dementia

18 - FINDINGS & RECOMMENDATION

caused by Alzheimer's disease.  Id.

Progress notes and treatment plans from Options Mental Health show that plaintiff remained a patient there until August 2007. Tr. 441-66.  After her September 11, 2006 evaluation, plaintiff next saw Rivera on September 14, 2006, Tr. 363, and saw her nine times over the next eleven months, at irregular intervals.  Tr. 466 (Oct. 18, 2006); Tr. 456 (Jan. 4, 2007); Tr. 457 (Jan. 24, 2007); Tr. 455 (Feb. 15, 2007); Tr. 454 (Mar. 22, 2007); Tr. 453 (Apr. 19, 2007); Tr. 451 (June 8, 2007); Tr. 448 (Aug. 2, 2007); Tr. 445 (Aug. 24, 2007).

On October 6, 2006, plaintiff had a CT scan of her head which was normal.  Tr. 373, 498.  On October 11, 2006, plaintiff had an "IVP," or intravenous pyelogram, to assess her kidneys, urinary tract, and bladder.  Tr. 372.  It was normal.  Id.  On that same date, plaintiff saw Dr. Richard Lowe, M.D. of Grants Pass Surgical Associates who reviewed test results with her, noting the presence of some mild gastritis, but no other problems.  Tr. 473.  Dr. Lowe noted plaintiff's continued complaint of abdominal pain.  Id.  He planned to proceed with an MRI of the lumbar spine and to review the records of a Dr. Traul who performed an ilioinguinal nerve entrapment surgery at some point in the past.  Id.  Finally, Dr. Lowe gave plaintiff some samples of a prescription medication used to treat acid reflux disease.  Id.

An October 20, 2006 MRI of plaintiff's lumbar spine showed mild disk bulges at L1-L2, L4-L5, and L5-S1, without evidence of nerve root impingement.  Tr. 371, 474, 507.  On October 31, 2006, plaintiff followed up with Dr. Lowe again who noted that the MRI showed only mild disk bulging and no foraminal nerve root

19 - FINDINGS & RECOMMENDATION

impingement. Tr. 472. Dr. Lowe had reviewed the report from the procedure in which Dr. Traul had freed plaintiff's ilioinguinal nerve from scar tissue. Id. Dr. Lowe recommended anesthetizing the nerve in an attempt to get rid of the pain plaintiff was experiencing. Id. Plaintiff was to schedule this as a separate appointment with Dr. Lowe. Id. He also gave her additional samples of the acid reflux medication. Id.

During the fall of 2006, plaintiff was seen at Siskiyou Community Health Center for complaints of headache, vertigo, chronic pelvic pain, and chronic low back pain. Tr. 490-94. She continued to receive prescriptions for her headache pain, as well as the anti-dementia medication. Id. The antidepressant she had been taking was stopped and another was prescribed. Tr. 494. She was also started on a muscle relaxant. Tr. 490.

On November 6, 2006, plaintiff had an electroencephalogram (EEG) performed by neurologist Dr. Joseleeto Chua, M.D. Tr. 384. Findings were normal, although Dr. Chua noted that the absence of epileptiform discharges did not rule out a seizure disorder and that clinical correlation was advised. Id.

On January 4, 2007, a practitioner at Siskiyou Community Health Center known only as "LB," with qualifications unknown, but who could possibly be Dr. Beachy, recommended that plaintiff avoid lifting more than ten pounds because of her back pain. Tr. 489. On January 22, 2007, plaintiff saw PA Swindells at the Siskiyou Community Health Center and complained of neck pain and low back pain. Tr. 487. She also complained of intermittent shooting pain in her arms. Id. PA Swindells noted that plaintiff looked uncomfortable and that her range of motion in her neck was limited

20 - FINDINGS & RECOMMENDATION

1  due to pain.  Id.

2  PA Swindells recommended that plaintiff proceed with Dr. Lowe

3  for the ilioinguinal nerve treatment procedure.  Id.  PA Swindells

4  also prescribed a narcotic-like pain reliever called Tramadol, to

5  try for pain.  Id.  A chart note dated January 20, 2007 indicates

6  that plaintiff's insurance refused to pay for the Tramadol.  Tr.

7  486.  In response, PA Swindells prescribed a non-steroidal anti-

8  inflammatory medication called etodolac.  Id.

9  On March 9, 2007, plaintiff was examined by optometrist Dr.

10  Michael W. Schwartz, D.O., for complaints that she had experienced

11  a "greying out" of vision to the right since her 2003 head injury.

12  Tr. 477.  Dr. Schwartz conducted a visual field examination and

13  found that plaintiff had significant "absolute and relative

14  scotomas"[4] to "left of fixation" in her right eye, but the findings

15  for her left eye were approximately normal.  Id.  In his

16  assessment, Dr. Schwartz noted that the losses to the left of

17  fixation in her right eye could suggest neurological damage.  Id.

18  Plaintiff returned to Dr. Chua on March 20, 2007.[5]  Tr. 382.

19  Plaintiff reported continued "horrible headaches" and decreased

20  mood to Dr. Chua.  Id.  Dr. Chua reported plaintiff's description

21

22  [4]  A "scotoma" is an "[i]slandlike blind gap in the visual
    field."  Taber's at 1288.  An absolute scotoma is an area in the
23  visual field in which there is absolute blindness, while a
    relative scotoma means perception of the object is impaired but
24  not completely lost.  Id.

25  [5]  The ALJ and the parties are under the impression that the
26  physician plaintiff saw on this date was Dr. Yung Kho, not Dr.
    Chua.  The letterhead on which Dr. Chua's evaluation is written
27  shows that the practice is Dr. Kho's, but a careful examination
    of the report indicates that it was written by Dr. Chua and Dr.
28  Chua conducted the exam.  Tr. 382-83.

21 - FINDINGS & RECOMMENDATION

of the pain as stabbing pain without warning, followed by right-sided pressure with non-vertiginous dizziness and at times with nausea at the height of the headache. Id. She also experienced both photophobia and phonophobia, although being in a darkened room did not alleviate her condition. Id.

Dr. Chua noted that a brain MRI and EEG were reviewed and unremarkable. Id. He also noted that plaintiff had a history of head trauma from domestic abuse, a history of depression, and multiple vague complaints and headaches which might be myofascial in nature, but could possibly be related to post-concussive syndrome. Id. He remarked that she had significant depression and would benefit from ongoing counseling and treatment by a psychiatrist. Id.

Plaintiff saw Dr. Chua again on April 20, 2007. Tr. 381. She reported decreased frequency and intensity of her "severe" headaches since starting a new medication Dr. Chua prescribed at the prior visit, but she related that she continued to have constant pressure headaches. Id. She also reported a decrease in her spontaneous episodes of imbalance or vertigo, down to one to two per week instead of daily, with duration decreased to five to thirty seconds from three to five minutes. Id. However, she also reported episodes of blanking out about twice per month. Id. She was advised to keep a diary of these events. Id. Dr. Chua assessed plaintiff as suffering from a traumatic brain injury, chronic daily headaches, and depression. Id. He increased the dosage of the daily migraine medication, and added a prescription for a muscle relaxer. Id.

On April 26, 2007, plaintiff and Options Mental Health

22 - FINDINGS & RECOMMENDATION

"Qualified Mental Health Associate" counselor Tawnya Moore added a treatment plan goal of getting plaintiff's child support straightened out.  Tr. 452.  On  July 20, 2007, Moore completed an annual comprehensive assessment of plaintiff's mental health.  Tr. 449-50.  She noted plaintiff's continued difficulty with memory loss including her difficulty remembering appointments and her medication schedule.  Tr. 449.  Moore also noted that plaintiff had not benefitted much from a variety of offered services partly due to her brain injury which caused her to miss appointments.  Id. Moore's assessment included Axis I diagnoses of dementia due to head injury, dysthymic disorder, and generalized anxiety disorder. Tr. 450.  Moore rated plaintiff's GAF score as 35.  Id.

The final medical record in the Administrative Record is a neuropsychological evaluation performed by clinical psychologist Grant Rawlins, Ph.D., on April 22, 2008, a few days after plaintiff's hearing before the ALJ.  Tr. 22-29.[6]  Dr. Rawlins interviewed plaintiff and conducted several tests.  Id.  He also reviewed Dr. Greene's March 2006 neuropsychological evaluation, the May 17, 2006 mental health assessment by counselor Davis at Options Mental Health, the September 2006 psychiatric evaluation by Rivera at Options Mental Health, the September 2006 letter to DDS/Social Security from Ward, and Dr. Chua's March 2007 and April 2007 evaluations.  Tr. 22-23.  It does not appear that Dr. Rawlins reviewed Dr. Villanueva's records.

Dr. Rawlins noted that plaintiff was adequately motivated,

---

[6]  My consideration of Dr. Rawlins's report is discussed below.

23 - FINDINGS & RECOMMENDATION

1   with no indication of deliberate exaggeration or malingering.  Tr.
2   25.   She looked nervous and scared when entering Dr. Rawlins's
3   office, but became less frightened as the interview continued.  Id.
4   She cried on and off throughout the evaluation.  Id.  Plaintiff's
5   responses were generally appropriate and informative, however
6   several times she said something, then repeated herself
7   immediately, not realizing she had already said the same thing.
8   Id.

9       Plaintiff's range of affect was highly restricted.  Tr. 26.
10  She reported significant sleep disturbance, requiring medication
11  for sleeping.  Id.  She was alert and knew the current date.  Id.
12  She did not know her social security number.  Id.  Although she
13  knew her birth date as well as the fact that she had recently had
14  a birthday, she could not recall her current age.  Id.  She knew
15  her address.  Id.   She described living in a home with her son and
16  one of her daughters.  Id.  She was unable to organize herself to
17  keep the house clean.  Tr. 27.  Her children helped some.  Id.  She
18  cooked only microwave meals because she had previously forgotten
19  things on the stove or oven, nearly causing fires.  Id.  She did
20  the shopping after her son made a list.  Id.  Her son helped her
21  manage her finances.  Id.

22      She was capable of using the phone, but she forgot to pay the
23  bill and it had been shut off.  Id.  She was presently using a
24  prepaid cell phone.  Id.  She did not drive much because driving
25  caused headaches, and because she sometimes forgot where she was
26  going or where she was.  Id.

27      Her verbal IQ was measured at 82, performance IQ at 78, and
28  full-scale IQ at 78, scores which were significantly lower then the
24 - FINDINGS & RECOMMENDATION

scores she received in 2006.  Id.  Dr. Rawlins expressly stated his belief that plaintiff put out her best effort in the current testing and he opined that it was probable that plaintiff's brain functioning was deteriorating over time.  Id.  Her current verbal IQ was toward the bottom of the low-average range, and her other scores were toward the top of the borderline retarded range.  Id. Plaintiff did particularly poorly on tasks requiring immediate memory, attention to visual detail, and general information.  Id.

On the Trail Marking test, her scores were "highly indicative of difficulty with concentration, eye-hand coordination, and visual processing, probably related to organic brain damage."  Tr. 28. Plaintiff's scores on the "WMS-II," a test emphasizing measurement of immediate and short-term auditory and visual memory, were in the retarded range.  Id.

In his diagnostic summary, Dr. Rawlins stated that plaintiff exhibited "serious symptoms" of organic brain damage related to her 2003 fall.  Id.  Her emotional functioning and short-term memory suffered the worst damage.  Id.  Dr. Rawlins noted that plaintiff exhibited significant chronic depression and anxiety, related to her difficulty with functioning and the complications it causes in her life.  Id.  He indicated that it was doubtful plaintiff could live independently without assistance.  Id.

Dr. Rawlins's Axis I diagnoses were dysthymic disorder, anxiety disorder NOS, and dementia due to head trauma.  Id.  He assessed her current GAF score as 40.  Id.  In a functional assessment, he considered her markedly impaired in her activities of daily living and again said that she was not capable of living independently without assistance.  Tr. 29.  She was not capable of

25 - FINDINGS & RECOMMENDATION

normal emotional reactions and since the head injury, she had withdrawn from most social contact. Id. She was unable to perform simple and repetitive tasks, let alone detailed and complex tasks. Id. She would not be able to perform work activities on a consistent basis, with or without special supervision. Id. She would not be capable of maintaining regular attendance in a work place, or completing a normal workday without interruptions from a psychiatric condition. Id. She would be unable to deal with the usual stress in competitive work. Id. Dr. Rawlins was unable to assess plaintiff's decompensation within the past year, but he was able to note that her functioning had deteriorated significantly since 2006, presumably due to the slow progression of brain damage. Id.

In the prognosis section, Dr. Rawlins opined that plaintiff's brain injury appeared to be permanent, with her functioning possibly continuing to deteriorate. Id. He noted that "[r]ecovery is unlikely." Id. He suggested continuing psychiatric follow-up and attending a brain injury support group. Id.

II. Plaintiff's Testimony

At the April 17, 2008 hearing, plaintiff initially testified about her last job which she held for less than three months at some point in 2007. Tr. 34, 194. Her employer, Marshall Motors, terminated her employment because of the number of accounting-type errors she made which cost the company over $26,000 as a result of bank fees, bounced checks, etc. Tr. 194. She also made many errors in regard to the Department of Motor Vehicles which created problems for the company. Id. The general manager of the company explained the termination in a December 30, 2007 letter which is in

26 - FINDINGS & RECOMMENDATION

1 the Administrative Record.  Id.; Tr. 194.  In describing the job,

2 and her termination, at the hearing, plaintiff indicated that the

3 errors occurred because of her memory problems.  Tr. 34-36.  The

4 letter written by the company's manager confirms that plaintiff's

5 forgetfulness was a problem.  Tr. 194.

6      Plaintiff also testified regarding self-employment earnings

7 she had in 2005 and 2006.  She said some of the income was from

8 collecting accounts receivable and a lot of it was from selling off

9 equipment, including computers, desks, and legal filing cabinets.

10 Tr. 37.  A portion of the income, about $1,625 for 2006 and $1,725

11 for 2005, was also for services plaintiff actually performed in

12 those years including retyping resumes and cover letters.  Tr. 40-

13 41.

14      Plaintiff also worked in 2005 for a company named Shan Creek

15 Enterprises.  Tr. 42.  She sat at the reception desk, answered the

16 door, answered the telephone, wrote down payments when people left,

17 and documented hours for payroll and bookkeeping clients.  Id.  She

18 worked approximately five days per week, six hours per day.  Id.

19 She was terminated because she kept forgetting what days to come to

20 work and her boss tired of reminding her.  Tr. 43.  She also had

21 problems performing the work because she forgot to do certain parts

22 of the job and then, she set the office on fire.  Tr. 43.

23 Plaintiff noted that her boss required her to light incense in the

24 morning, before the boss arrived, and to sweep the porch.  Id.

25 Plaintiff left the incense burning while sweeping, and the incense,

26 which had been stuck in a plant, caught the plant on fire and the

27 fire spread to the wall.  Id.

28      Plaintiff also testified about one other job attempt in 2006

27 - FINDINGS & RECOMMENDATION

when she worked for a church doing various administrative tasks, including paying the bills. Tr. 44. It was part-time work. Id. She was let go before the end of what was supposed to be a three-month trial period. Id.

When asked to describe the problems that keep her from working, plaintiff testified that she forgets a lot of things and has problems concentrating. Tr. 45. She also stated that she has problems being with people or in the presence of the public because it is nerve-wracking and frustrating which then makes her upset and mad. Tr. 46. She blamed her October 2003 head injury for these problems. Id.

Plaintiff also described experiencing low back pain, including sciatic pain going down her left leg, as well as problems with her neck vertebrae. Tr. 47. She then described her headaches, indicating that she actually experiences different types of headaches. Tr. 48. Some, she noted, are so bad that she just goes to bed. Id. Others are nagging, meaning that they are constantly there, but she just tries to "deal with" them. Id. Sometimes she experiences a different "crushing" pain when she moves her head certain ways. Id.

The headaches which cause her to go to bed occur at lest once per week, if not more. Id. They typically last all day. Id. She takes medication prescribed by her doctor and lies down, but the headache still makes her feel ill, including making her feel sick to her stomach. Id.

At the time of the hearing, plaintiff was still a patient at Options Mental Health. Tr. 50. She received medication for depression from Rivera and worked with a counselor to try to help

28 - FINDINGS & RECOMMENDATION

1   her be more organized.  Id.  Rivera apparently not only prescribed

2   medication for plaintiff, but packaged it into packs with days

3   written on them so that plaintiff can remember what day the

4   medication is supposed to be taken.  Id.

5       When asked to describe a typical day and her living situation,

6   plaintiff testified that she lived in a home with her fifteen year

7   old son.  Tr. 54.  Her seventeen year old daughter moved out of the

8   home approximately four months before the hearing.  Tr. 56.  Her

9   son usually rides the bus to school.  Id.  They eat a lot of TV

10  dinners that they can microwave, or they have sandwiches or cereal.

11  Id.  Her son helps her with housework.  Id.

12      Plaintiff's father helps her with repairs around the house.

13  Tr. 56.  Plaintiff has a driver's license and a car.  She said she

14  does not have difficulty driving, although she also said she does

15  not drive very much.  Id.  Her older daughter, no longer living at

16  home, takes plaintiff "lots of places."  Id.

17      Plaintiff tries to go to church once or twice each week.  Tr.

18  59.  But, it is hard for her because she encounters people who

19  remember her before her head injury and who expect that she will

20  remember things.  Id.

21      Plaintiff shops for groceries and household supplies with some

22  difficulty.  Id.  Her son writes a list, but she forgets it.  Id.

23  She ends up stocking up on the same thing over and over because she

24  remembers the same thing instead of what was actually needed.  Id.

25      She does not go to movies, restaurants, dinner, or dates,

26  other than occasionally taking her son to Taco Bell.  Tr. 60.  She

27  used to be in a choir, but got too dizzy to stand on the risers so

28  she no longer participates.  Id.

29 - FINDINGS & RECOMMENDATION

III.   Lay Witness Testimony

Plaintiff's father also testified at the hearing.  Tr. 63.  He tries to see her everyday, but sometimes goes three to five days between visits.  Id.  He testified that plaintiff had changed since her October 2003 head injury, including difficulty remembering, concentrating, and getting along with people.  Tr. 64.  He remarked that even getting along with him had changed.  Id.  He also remarked on her breaking out in huge hives.  Id.  He noted that before the injury, she was "so smart" as a paralegal and had "done sports," but since that injury, she could not concentrate and does not go out.  Tr. 65.  She stays home most of the time.  Id.  He stated that she was unable to hold a job.  Id.

Plaintiff's father helps her with her children and around the house.  Id.  He also testified that plaintiff's brother helps too. Id.

IV.   Vocational Expert Testimony

Vocational Expert (VE) Lynn Jones testified at the hearing. Tr. 68-72.  VE Jones first classified plaintiff's past work as general office clerk.  Tr. 68-69.  Next, the ALJ presented VE Jones with the following hypothetical:  a person of plaintiff's age, education, and work history, who is limited to frequently lifting and carrying  more than twenty-five pounds, with an occasional fifty-pound maximum.  Tr. 69.  The person needs to avoid dangerous hazards, including heights and balance hazards.  Id.  The person is unable to reliably perform fine motor tasks.  Id.  The person is unable to multi-task, organize, or establish her own work plans and goals.  Id.  The person is limited to simple tasks, and is unable to follow complex or detailed instructions.  Id.  The person is

30 - FINDINGS & RECOMMENDATION

1  unable to reliably remember instructions without written notes.

2  Id.  The person is unable to drive unless the area is familiar to

3  her, and the person is unable to work with the public unless it is

4  occasional and superficial.  Id.

5      In response, VE Jones stated that the person could not perform

6  the identified past work.  Id.  However, VE Jones then identified

7  the following jobs that such an individual could perform:  hand

8  packager and laundry laborer with both being classified as medium,

9  unskilled work.  Tr. 71.  When asked about light work, she added

10  hand stuffer.  Id.

11      In response to a question by plaintiff's counsel, VE Jones

12  testified that a person who is chronically absent one or two days

13  per month is not competitively employable.  Id.  Plaintiff's

14  counsel also specifically inquired about the fine motor skill

15  portion of the jobs identified by VE Jones, and although the ALJ

16  noted that an inability to reliably engage in fine motor tasks was

17  part of the hypothetical, VE Jones stated that the identified jobs

18  relied more on grasping and gross motor rather than fine,

19  manipulative tasks.  Id.  Additionally, in response to another

20  question from plaintiff's counsel about a requirement of working

21  closely with employees, VE Jones said that none of the identified

22  jobs were teamwork jobs and were not "particularly elbow to elbow

23  type jobs."  Tr. 72.  She opined that one could probably never get

24  away from having some interaction with one's coworkers.  Id.

25                          THE ALJ'S DECISION

26      The ALJ first determined that plaintiff had engaged in

27  substantial gainful activity since her alleged onset date through

28  the first quarter of 2007 and thus, she was ineligible for

31 - FINDINGS & RECOMMENDATION

disability benefits during that time period. Tr. 14-15. Next, the ALJ determined that plaintiff had the following impairments: dementia due to head trauma, anxiety order with depression, possible post-traumatic stress disorder, pain disorder with medical and psychological factors, and headaches. Tr. 15. He stated that she had "a severe impairment," but he did not identify which one of her impairments he considered severe. Id. He also noted that she had several "conditions of questionable impact on work capacity," which he noted were "likely nonsevere," including asthma, peptic ulcer disease/gastroesophageal reflux disease/gastritis, and mild degenerative disc disease. Id. The ALJ then determined that plaintiff did not have an impairment, or a combination of impairments, that met or equaled a listed impairment. Id.

Next, the ALJ found plaintiff to have the residual functional capacity (RFC) to perform medium work, except she should avoid dangerous hazards such as heights and activities that require balance, and that she was unable to multi-task or organize, unable to establish her own work plans or goals, was limited to simple tasks because she is unable to follow complex or detailed instructions, and she may need written notes because she is unable to reliably remember instructions. Tr. 16. The ALJ also included the restrictions that plaintiff is unable to drive in areas with which she is unfamiliar because she gets lost, is unable to work with the public in more than occasional and superficial contact, and is unable to reliably perform fine motor tasks. Id.

Based on this RFC, the ALJ found that plaintiff could not perform her past relevant work. Tr. 19. But, the ALJ, relying on the VE's testimony, found that she could perform the jobs of hand

32 - FINDINGS & RECOMMENDATION

packager, laundry laborer, and hand stuffer.  Tr. 20.  Accordingly,
the ALJ found plaintiff not disabled.  Tr. 21.

STANDARD OF REVIEW & SEQUENTIAL EVALUATION

A claimant is disabled if unable to "engage in any substantial
gainful activity by reason of any medically determinable physical
or mental impairment which . . . has lasted or can be expected to
last for a continuous period of not less than 12 months[.]"  42
U.S.C. § 423(d)(1)(A).    Disability claims are evaluated according
to a five-step procedure.  Baxter v. Sullivan, 923 F.2d 1391, 1395
(9th Cir. 1991).    The claimant bears the burden of proving
disability.   Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir.
1989).  First, the Commissioner determines whether a claimant is
engaged in "substantial gainful activity."  If so, the claimant is
not disabled.   Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20
C.F.R. §§ 404.1520(b), 416.920(b).  In step two, the Commissioner
determines whether the claimant has a "medically severe impairment
or combination of impairments."  Yuckert, 482 U.S. at 140-41; see
20 C.F.R. §§ 404.1520(c), 416.920(c).  If not, the claimant is not
disabled.

In step three, the Commissioner determines whether the
impairment meets or equals "one of a number of listed impairments
that the [Commissioner] acknowledges are so severe as to preclude
substantial gainful activity."  Yuckert, 482 U.S. at 141; see 20
C.F.R. §§ 404.1520(d), 416.920(d).    If so, the claimant is
conclusively presumed disabled; if not, the Commissioner proceeds
to step four.  Yuckert, 482 U.S. at 141.

In step four the Commissioner determines whether the claimant
can still perform "past relevant work."  20 C.F.R. §§ 404.1520(e),

33 - FINDINGS & RECOMMENDATION

1  416.920(e).  If the claimant can, he is not disabled.  If he cannot

2  perform past relevant work, the burden shifts to the Commissioner.

3  In step five, the Commissioner must establish that the claimant can

4  perform other work.  Yuckert, 482 U.S. at 141-42; see 20 C.F.R. §§

5  404.1520(e) & (f), 416.920(e) & (f).  If the Commissioner meets its

6  burden and proves that the claimant is able to perform other work

7  which exists in the national economy, he is not disabled.  20

8  C.F.R. §§ 404.1566, 416.966.

9       The court may set aside the Commissioner's denial of benefits

10  only when the Commissioner's findings are based on legal error or

11  are not supported by substantial evidence in the record as a whole.

12  Baxter, 923 F.2d at 1394.  Substantial evidence means "more than a

13  mere scintilla," but "less than a preponderance."  Id.  It means

14  such relevant evidence as a reasonable mind might accept as

15  adequate to support a conclusion.  Id.

                                DISCUSSION

17       Plaintiff contends that the ALJ made many errors in his

18  determination, including (1) finding that plaintiff engaged in

19  substantial gainful activity until March 2007; (2) finding that her

20  organic brain disorder did not meet or equal Listing 12.02; (3)

21  rejecting plaintiff's testimony; (5) rejecting plaintiff's lay

22  witnesses' testimony or written statements; and (6) relying on an

23  invalid hypothetical.  Additionally, plaintiff contends that the

24  Appeals Council erred in rejecting Dr. Rawlins's opinion.

25  I.  Substantial Gainful Activity

26       At step one of the sequential analysis, the ALJ found that

27  plaintiff's earnings constituted substantial gainful activity (SGA)

28  through March 2007.  Tr. 15.  Plaintiff contends that her earnings

34 - FINDINGS & RECOMMENDATION

record contains income from the sale of office equipment from her failed business which does not qualify as SGA.

A claimant is not disabled for any period in which the claimant was performing SGA.   20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b), 416.920(a)(4)(i), 416.920(b).   SGA is "work activity that is both substantial and gainful[.]"   20 C.F.R. §§ 404.1572, 416.972.   "Substantial work activity is work activity that involves doing significant physical or mental activities."   20 C.F.R. §§ 404.1572(a), 416.972(a).   "Gainful work activity is work activity that you do for pay or profit.   [It] is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized."   20 C.F.R. §§ 404.1572(b), 416.972(b).

The ALJ stated that the record showed that plaintiff had earnings of $10,499.16 in 2003, $11,642.80 in 2004, $11,410.40 in 2005, and $12,859 in 2006.   Tr. 14.   Additionally, the ALJ stated that the record showed plaintiff earned $3,740 in the first quarter of 2007, and $1,737 in the fourth quarter of 2007.   Id.

The ALJ explained that although plaintiff testified that she stopped working on April 15, 2005, and that most of the reported earnings reflected sales of office equipment and collection of accounts receivable, the applicable regulations provide that work activity through self-employment can be considered SGA even if the earnings do not amount to presumptive levels, based on the substantial contribution inherent in self-employment.   Tr. 15 (citing 20 C.F.R. § 1575).   The ALJ then explained that for purposes of eligibility for disability benefits, sales could not be differentiated from earnings, which, he said, were in excess of the amounts set forth by the regulations and "this income is therefore

35 - FINDINGS & RECOMMENDATION

solely attributable to her as representing [SGA] through March 2007."

Plaintiff contends that her hearing testimony establishes that the earnings attributed to her in 2005, 2006, and 2007, can be segregated into earnings from services actually performed in those years and earnings from the sale of her equipment. She notes her hearing testimony that with the exception of $1,725 in 2005, $1,825 in 2006, and less than $2,000 in 2007, her earnings came from the sale of office equipment formerly used in her business or payments for work done years earlier. Tr. 34, 37-45.

Plaintiff argues that her sale of capital assets from a failed business is not "work activity" under the regulations because it did not involve the performance of significant physical or mental activities and was not the kind of activity usually done for pay or profit. As support, plaintiff cites to 20 C.F.R. § 404.1084 which addresses the treatment of gain from the sale of a capital asset in determining net earnings from self-employment.

The regulation provides that in determining net earnings from self-employment for the purposes of social security coverage, any gain from the sale of a capital asset must be excluded. 20 C.F.R. § 404.1084(a). Plaintiff argues that the ALJ erred in failing to distinguish between plaintiff's earnings from actual work activity (which apparently, is undisputedly insufficient to be SGA), and plaintiff's income from the sale of her office equipment, which, plaintiff contends, under defendant's own regulations is not to be counted as earnings.

In response, defendant notes that contrary to plaintiff's assertions, self-employment qualifies as SGA when the claimant

36 - FINDINGS & RECOMMENDATION

"render[s] services that are significant to the operation of the business and receive[s] a substantial income from the business." 20 C.F.R. §§ 404.1575(a)(2)(i), 416.975(a)(1). Furthermore, if the claimant operates the business by herself, any services rendered are significant to the business.   20 C.F.R. §§ 404.1575(b)(1), 416.975(b)(1).

Defendant notes that the hearing testimony establishes that other than assistance from her father in physically moving things out of the house, plaintiff wound up the business by herself. Defendant argues that selling the business's assets is a work activity requiring significant mental activity, and which produced many thousands of dollars in the process. Accordingly, defendant contends, the ALJ properly considered the income from this activity in determining whether plaintiff engaged in SGA.   Finally, defendant notes that the regulation relied on by plaintiff, 20 C.F.R. § 404.1084, is not relevant because it addresses how net earnings from self-employment are treated for purposes of social security coverage and does not concern presumptive levels of income for purposes of determining SGA.

I agree with defendant.   First, the regulation cited by plaintiff is not relevant because "SGA" is a term of art and the regulation addresses a different issue in a different context.

Because this regulation appears in Part 404 of Title 20, it is a regulation relevant to "federal old-age, survivors, and disability insurance[.]"   See Title of Part 404 in Table of Contents to Part 404, immediately following 20 C.F.R. § 403.155. The regulation appears in "Subpart K" to Part 404, which addresses "employment, wages, self-employment and self-employment income."

37 - FINDINGS & RECOMMENDATION

1   See Title of Subpart K immediately preceding 20 C.F.R. § 404.1001.

2   Subpart K generally addresses how the Social Security

3   Administration calculates one's earnings in order to determine the

4   appropriate amount of "social security benefits." See 20 C.F.R. §

5   404.1001(a)(1).

6        Regulations beginning with 20 C.F.R. § 404.1065 and continuing

7   until 20 C.F.R. § 404.1096, address issues particular to self-

8   employment and self-employment earnings. As explained in 20 C.F.R.

9   § 404.1065, "[f]or an individual to have self-employment coverage

10  under social security, the individual must be engaged in a trade or

11  business and have net earnings from self-employment that can be

12  counted as self-employment income for social security purposes."

13  20 C.F.R. § 404.1065 (further stating that rules explaining whether

14  an individual is engaged in a trade or business are in §§ 404.1066

15  through 404.1077, while what constitutes net earnings from self-

16  employment are discussed in §§ 404.1080 through 404.1095). It is

17  obvious that the regulation cited by plaintiff is not relevant to

18  a determination of SGA.

19       Second, plaintiff bears the burden at step one of the

20  sequential analysis. Here, the hearing testimony by plaintiff and

21  her father fairly indicates that plaintiff herself performed the

22  tasks required to sell the equipment other than the physical moving

23  of it which her father did for her. Although not in the record, it

24  is reasonable to assume that plaintiff decided what to sell, when

25  to sell it, how much to ask for it, placed advertisements,

26  responded to advertisements, and negotiated with prospective

27  buyers. While the Court recognizes that plaintiff was selling her

28  equipment only because she believed she was too disabled to

38 - FINDINGS & RECOMMENDATION

continue with her self-employment, it appears that significant mental activity was required to execute the sales. Furthermore, plaintiff received substantial income from the sales and the sale of capital assets is properly considered an activity engaged in for pay or profit.

Third, while I sympathize with plaintiff's position that she sold the assets because she was too disabled to work in her own business, without any cases or more relevant regulations suggesting that this particular activity should not be counted, I am unwilling to overrule the ALJ's determination. The factual record supports the ALJ's findings, there is no law suggesting he made a legal error, and the Court is required to use a deferential standard of review.

II.  Listed Impairment

Plaintiff argues that the ALJ erred by determining that her impairments do not meet or equal the listed impairment for organic brain disorder. Listing 12.02 provides as follows:

> 12.02 *Organic Mental Disorders*: Psychological or behavioral [sic] abnormalities associated with a dysfunction of the brain. History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> A. Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:
>
> 1.  Disorientation to time and place; or
> 2.  Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime

39 - FINDINGS & RECOMMENDATION

in the past); or
3.  Perceptual or thinking disturbances (e.g. hallucinations, delusions); or
4.  Change in personality; or
5.  Disturbance in mood; or
6.  Emotional lability (e.g. explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or
7.  Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g. the Luria-Nebraska, Halstead-Reitan, etc.;

AND

B.  Resulting in at least two of the following:

1.  Marked restrictions of activities of daily living; or
2.  Marked difficulties in maintaining social functioning; or
3.  Marked difficulties in maintaining concentration, persistence, or pace; or
4.  Repeated episodes of decompensation, each of extended duration[.]

20 C.F.R. Pt. 404, Subpt P. App. 1, Listing 12.02.[7]

In considering whether plaintiff's impairments met or equaled a listed impairment, the ALJ looked at Listings 12.02, 12.04 (governing affective disorders), and 12.06 (governing anxiety related disorders).  In this action, plaintiff challenges only the determination that she does not meet or equal Listing 12.02.

The ALJ made no findings regarding the "Paragraph A" criteria of the listing.  Tr. 15.  He found, however, that plaintiff's impairments did not meet the "Paragraph B" criteria.  Id. Specifically, he found that plaintiff had moderate restrictions in her activities of daily living, moderate difficulties in social functioning, and moderate difficulties in concentration,

---

[7]  I do not quote the "Paragragh C" criteria because plaintiff does not challenge the "Paragraph C" finding.

persistence, or pace.  Id.  He further found that she had no

episodes of decompensation.  Id.  He explained that because

plaintiff's impairments did not cause at least two "marked"

limitations or one "marked" limitation and "repeated" episodes of

decompensation, the "Paragraph B" criteria were not satisfied.  Tr.

15-16.  He also found that the evidence failed to establish the

presence of any "Paragraph C" criteria.  Tr. 16.

In this section of his decision, the ALJ offered no reasons in

support of these findings.  However, later, in making the

determination regarding plaintiff's RFC, he offered some

explanation.  In making this RFC finding, the ALJ considered "all

symptoms and the extent to which these symptoms can reasonably be

accepted as consistent with the objective medical evidence and

other evidence."  Id.  He noted the appropriate analysis for

consideration of plaintiff's symptoms.  Id.

The ALJ then summarized plaintiff's allegations, including her

testimony, as well as the letter from her former employer at

Marshall Motors regarding her termination, her brother's written

statements about plaintiff's limitations, and her father's

testimony.  Tr. 16-17.  Following this, the ALJ explained that

> [w]hile the claimant's impairments can be expected to
> cause symptoms and limitations that reduce her overall
> functioning from what she was previously able, thus
> precluding her ability to perform her prior work, the
> objective evidence shows that the claimant maintains the
> residual functional capacity to perform other work in the
> national economy, as explained below.  Therefore, after
> considering the evidence of record, the undersigned finds
> that the statements made by the claimant and third
> parties concerning the intensity, persistence, and
> limiting effects of her symptoms are generally credible,
> but in light of the medical evidence discussed below,
> these statements are given less weight to the extent they
> are inconsistent with the residual functional capacity
> assessment above.

41 - FINDINGS & RECOMMENDATION

Tr. 17.

Following this, the ALJ began a discussion of the medical evidence.   Tr. 18.   He first discussed Dr. Greene's March 2006 evaluation and specifically stated that he "accepts Dr. Greene's assessment."   Id.   The ALJ stated that while plaintiff's impairments had not significantly improved with time, as initially expected by Dr. Villanueva, the evidence did not demonstrate that plaintiff's impairments had worsened.   Id.

The ALJ then noted that there were "minimal" treatment notes from Options Mental Health.   Id.   He gave no weight to Rivera's September 2006 GAF 45 score because "a GAF is a rating of how intensely the patient reported subjective symptoms." Id.   He also found that this GAF score was "outweighed by other scores that are consistently assigned between 55 and 60, with some situational variations."   Id.   He further remarked that plaintiff had not maintained regular mental health treatment as had been recommended. Id.

The ALJ then discussed plaintiff's headaches and musculoskeletal pain.   Tr. 18-19.   He also noted the negative ultrasound for kidney stones, and testing showing only mild to moderate reflux disease.   Tr. 19.   He found that plaintiff's documented hearing loss did not present a significant disability and that while plaintiff had referenced vision loss, it was not demonstrated by testing.   Id.   Finally, he noted that her asthma symptoms were controlled with medication on an as-needed basis. Id.

In concluding this discussion, the ALJ explained that

[a]s noted above, while the claimant's impairments have

42 - FINDINGS & RECOMMENDATION

precluded her ability to engage in high level functioning as she was previously accustomed, despite her impairments, the claimant retains the ability to function with the specified limitations. The undersigned notes that the claimant has expressed frustration and an inability to hold a job, but that the jobs she has tried performing required skills in excess of her residual functional capacity.

Id.

Plaintiff argues that Dr. Greene's evaluation substantiates that plaintiff's impairments meet both the "Paragraph A" and "Paragraph B" criteria for Listing 12.02, and that the record demonstrates that plaintiff's condition did indeed decline over time. Thus, plaintiff contends that the ALJ erred in his finding that plaintiff's impairments do not meet or equal the criteria for Listing 12.02.

I first discuss the "Paragraph B" criteria. As noted, Dr. Greene found that plaintiff's attention and executive functioning were moderately to severely impaired. Tr. 270. She further found marked levels of clinical depression and anxiety. Id. In explaining the attention deficits, Dr. Greene noted that plaintiff's attention problems showed up in poor concentration, heightened distractibility, and difficulty doing more than one thing at a time. Id. In describing the depression and anxiety, Dr. Greene stated that plaintiff experienced social isolation, anxiety, and depression as a result of apathy and cognitive deficiencies. Id. Plaintiff's anxiety and depression were reactive to her appreciation of her cognitive limitations, loss of independence, and future goals. Id.

Dr. Greene further noted that plaintiff was struggling in the areas of "attention, memory and a broad range of information

43 - FINDINGS & RECOMMENDATION

processing skills" to "a point where it is [a]ffecting social, school, employment, and general day-to-day activities." Tr. 270. According to Dr. Greene, plaintiff "is failing at work and in school and is not functioning even in her basic day to day activities." Tr. 271. In the end, Dr. Greene rated plaintiff's GAF score as 55 and expressly noted that plaintiff was "failing at work and school." Id.

Defendant concedes that Dr. Greene found plaintiff to be "not functioning even in her basic day-to-day activities" and further concedes that Dr. Greene described plaintiff as "forgetful in all areas of her day-to-day living." Deft's Mem. at p. 8. Defendant argues that while Dr. Greene's "findings are more detailed than contemplated by the listings," when considered collectively, they are consistent with the ALJ's determination that plaintiff's impairments support only moderate limitations. Defendant also notes that despite Dr. Greene's observations, she failed to assess a particular degree of limitation in regard to plaintiff's activities of daily living.

The problem, as I see it, is that Dr. Greene's report is ambiguous, and possibly internally inconsistent. Thus, while the ALJ states he accepts Dr. Greene's assessment, it is unclear if the ALJ fully considered her report. As a result, his conclusion, based on Dr. Greene's report, that plaintiff has only moderate restrictions in the Paragraph B criteria is not clearly supported by Dr. Greene's report.

A.  Activities of Daily Living

As to activities of daily living, defendant correctly notes that Dr. Greene did not expressly rate a degree of impairment for

44 - FINDINGS & RECOMMENDATION

1  this factor.  But, several of her ratings are relevant, as are her
2  descriptions of plaintiff's functioning.

3      Dr.  Greene  rated  plaintiff  as  having  a  severe  memory
4  impairment,  a  marked  level  of  depression  and  anxiety,  and  a
5  moderate to severe impairment in attention and executive function.
6  An assessment that an impairment is "moderate to severe" means that
7  the  impairment  falls  somewhere  between  moderate  and  severe.   As
8  defendant notes in its memorandum, the assessment of "moderate to
9  severe" means the impairment is in a range that was "less than
10  severe."  Deft's Mem. at p. 10.  That is correct.  But, the
11  impairment  is,  by  the  same  token,  in  a  range  that  is  more  than
12  moderate.

13      Defendant's  forms  in  which  the  "Paragraph  B"  criteria  are
14  assessed by DDS practitioners, show various degrees of limitation
15  with "marked" as the degree of limitation between "moderate" and
16  "extreme."   E.g.,  Tr.  298  (Section  III  of  Psychiatric  Review
17  Technique  Form).   Under  defendant's  regulations,  a  marked
18  limitation is "more than moderate but less than extreme" and is a
19  "degree of limitation [] such as to interfere seriously with [the
20  claimant's]  ability  to  function  independently,  appropriately,
21  effectively, and on a sustained basis."  20 C.F.R. Pt. 404, Subpt.
22  P, App. 1, § 12.00C.

23      Because  Dr.  Greene  found  plaintiff's  impairment  in  the
24  attention and executive function category to be somewhere between
25  moderate and severe, which, following defendant's own logic must
26  mean something more than moderate, it is quite possible that in
27  terms  of  the  lexicon  used  by  defendant,  her  assessment  of
28  plaintiff's  attention  and  executive  function  was  of  a  "marked"

45 - FINDINGS & RECOMMENDATION

impairment, meaning between moderate and extreme.

Such as assessment would be consistent with her descriptions of plaintiff's ability to function in her daily activities.  First, Dr. Greene stated that plaintiff is "clearly struggling in [the areas of attention, memory, and information processing skills] to a point where it is effecting [sic] social, school, employment and general day-to-day activities."  Tr. 270 (emphasis added).  Next, she stated that plaintiff "is forgetful in all areas of her day-to-day living."  Id.  Finally, Dr. Greene stated that plaintiff "is failing at work and in school and is not functioning even in her basic day to day activities."  Tr. 271 (emphasis added).  Notably, Dr. Greene's statements are not conditioned by any qualifying remarks such as "not fully functioning," or "is barely functioning."

Defendant notes that Dr. Greene assessed plaintiff's GAF score as 55, indicating only moderate impairments.  The GAF scale shows that a 55 falls in the 51-60 range, indicating moderate symptoms or moderate difficulty in social, occupational, or school functioning. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed. Text Revision 2000) (DSM-IV). Curiously, while Dr. Greene gave the GAF score as 55, the entry for Axis V in its entirety reads "GAF:55  failing at work and school[,]" suggesting that plaintiff's level of impairment was far more than "moderate."  Tr. 271.  Additionally, Dr. Greene recommended that plaintiff apply for disability services, further suggesting that she viewed plaintiff's impairments as more than moderate.

Overall, Dr. Greene's assessment of plaintiff's limitation in

46 - FINDINGS & RECOMMENDATION

the area of activities of daily living indicates that Dr. Greene
may have considered plaintiff to have been markedly impaired, or,
she may have considered plaintiff to have been more than moderately
impaired, but not markedly impaired.  The report is unclear and the
ALJ should not have interpreted it as supporting only a moderate
level of impairment because the report supports a level of
impairment greater than moderate.

    B.  Concentration, Persistence, and Pace

    As to impairments in the area of maintaining concentration,
persistence, and pace, defendant concedes that Dr. Greene found a
moderate impairment in visual-motor integration, a moderate
impairment of the right hand, and a severe impairment for fine
motor dexterity in the left hand.  Id.; Tr. 270.  And, as above,
defendant concedes that Dr. Greene found plaintiff to have poor
concentration, heightened distractibility, and a moderate to severe
impairment in attention and executive functioning.  Id.

    Both the ALJ and defendant make no further mention of the
expressly stated severe left hand dexterity impairment which could
have a severe impact in regard to pace of work.  At a minimum, the
ALJ should have attempted to determine if plaintiff is right or
left-handed and should have discussed the impact of the impairment
on the issue of pace.

    As to the concentration and persistence factors, defendant
argues that because Dr. Greene assessed the attention and executive
functioning deficit as moderate to severe, plaintiff's impairment
is less than severe.  This is discussed above and as indicated
there, the "moderate to severe" assessment is capable of being
understood as a "marked" impairment when compared to defendant's

47 - FINDINGS & RECOMMENDATION

1  own rating forms.

2      Additionally, the descriptions of plaintiff's functioning

3  provided by Dr. Greene in her report, as quoted above, show that

4  she considered plaintiff's impairment in attention and executive

5  function skills to seriously interfere with plaintiff's ability to

6  function independently, appropriately, effectively, and on a

7  sustained basis.  Based on the impairment being rated as between

8  moderate and severe, and Dr. Greene's narrative findings of limited

9  functioning, Dr. Greene's report suggests that plaintiff may have

10  marked difficulties in maintaining concentration, persistence, and

11  pace.

12      The ALJ's interpretation of Dr. Greene's evaluation, an

13  evaluation which the ALJ himself expressly accepted, Tr. 18, to

14  conclusively establish the existence of only moderate restrictions

15  in activities of daily living and in maintaining concentration,

16  persistence, or pace, is not consistent with a reading of Dr.

17  Green's entire report.  Dr. Greene's report, while perhaps

18  assessing plaintiff's overall functioning as moderately impaired,

19  is suggestive of possible marked impairments in daily living

20  activities and in the ability to maintain concentration,

21  persistence, and pace.  Dr. Greene's report cannot be reasonably

22  construed as establishing only moderate impairments because it

23  clearly supports something more than that.  But, it is unclear,

24  based on Dr. Greene's report, if the impairments as assessed by Dr.

25  Greene, rise to a marked level.  This is a question that must be

26  answered by the ALJ on remand.

27      Additionally, contrary to the ALJ's finding, the evidence

28  indicates that plaintiff's impairments worsened over time.  Dr.

48 - FINDINGS & RECOMMENDATION

Villanueva, who saw plaintiff in late 2003 and then in March and April 2004, found no memory impairment, Tr. 514, but in January through March 2006, Dr. Greene found a severe impairment in memory. Tr. 270.    In September 2006, Rivera conducted a MMSE, or mini-mental state examination, which showed "true cognitive impairment" including difficulty with orientation, attention/calculation, and memory recall.    Tr. 355.    Then, in April 2008, Dr. Rawlins found "serious symptoms" of organic brain damage with emotional functioning and short-term memory suffering the worst damage.    Tr. 28.

The several GAF scores which the ALJ discounted also reflect subjective deterioration over time.    Following Dr. Greene's evaluation in January through March 2006, and the GAF score of 55 given by Dr. Greene, plaintiff received the following GAF scores: 50 from Davis in May 2006, 45 from Rivera in September 2006, 35 from Moore in July 2007, and 40 from Dr. Rawlins in April 2008. Tr. 370, 356, 450, 28.

The only score the ALJ discussed was Rivera's, which he rejected because, according to the ALJ, "a GAF is a rating of how intensely the patient reported subjective symptoms," and, he explained, "this rating is outweighed by other scores that are consistently assigned between 55 and 60, with some situational variations."    Tr. 18.    First, I find no other GAF scores in the Administrative Record, other than those cited in the previous paragraph, none of which are between 55 and 60.

Second, as I understand the ALJ, he is of the opinion that a GAF score simply reflects a patient's subjective statements made to a practitioner.    Defendant argues that without a narrative

49 - FINDINGS & RECOMMENDATION

explaining the reasons for assigning a particular GAF score, the
score itself is not evidence of functioning.  Defendant bases its
argument on the fact that the description of each ten-point range
in the GAF scale has two components, with the first covering
symptom severity and the second covering functioning.  DSM-IV at p.
32.  That is, the GAF score is within a particular ten-point range
if either the symptom severity or the level of functioning falls
within the range.  Id.

According to the DSM-IV, the GAF scale, "is for reporting the
clinician's judgment of the individual's overall level of
functioning."  Id.  The scale "may be particularly useful in
tracking the clinical progress of individuals in global terms,
using a single measure."  Id.  The scale is "to be rated with
respect only to psychological, social, and occupational
functioning."  Id.  Impairments in functioning due to physical or
environment limitations are excluded.  Tr. 32, 34.

Nothing in the relevant portion of the DSM-IV indicates that
a practitioner's score must be accompanied by a narrative in order
to reflect the patient's functioning or to be valid.  Nothing in
the relevant portion of the DSM-IV indicates that the practitioner
assesses the GAF score based solely on the subjective statements of
the patient without the practitioner having considered the
credibility of those statements.

While some psychological testing may afford a practitioner
some objective assessment tools, because the GAF scale assesses
only psycho-social/occupational functioning, it will always be
based, to some degree, on a patient's report of subjective
symptoms.  Thus, to reject a GAF score because it is based on the

1  patient's subjective statements is essentially stating that all GAF
2  scores are inherently unreliable assessments.   This fails to
3  acknowledge that the DSM-IV itself states that the score reports
4  the "clinician's judgment" of the overall level of functioning.

5       Even if a narrative were required to give weight to the GAF
6  scores in this record, each GAF score cited above is accompanied by
7  a narrative.  Davis's May 2006 GAF score of 50 is part of a multi-
8  page assessment in which she notes plaintiff's cognitive
9  impairments, short- and long-term memory loss, and inability to
10 hold a job.  Tr. 370.  She states that plaintiff has no symptoms of
11 an eating disorder.   Id.  A GAF score of 50 reflects "serious
12 symptoms" or "serious impairment in social, occupational, or school
13 functioning."  DSM-IV at p. 34.  As examples of serious symptoms,
14 the DSM-IV lists suicidal ideation, severe obsessional rituals, or
15 frequent shoplifting.  Id. Examples of serious problems in social,
16 occupational, or school functioning include no friends and the
17 inability to keep a job.   Id.

18    Rivera's GAF score of 45 is part of a six-page evaluative
19 report dated September 11, 2006.  Tr. 352-57.  Rivera addressed
20 plaintiff's history of present illness, psychiatric history,
21 substance abuse history, family history, medical history, and more.
22 Id.  She noted plaintiff's "blocking" and "concrete" "flow of
23 thought," her blunted and tearful affect, her suspicious, somatic,
24 and hopelessness content of thought, her recent and remote memory
25 impairment, and that plaintiff was easily distracted.   Tr. 355.
26 She rated her as moderate in separate depression and anxiety rating
27 scales and stated that plaintiff met the criteria for a depressed
28 mood disturbance.   Id.  Rivera also noted that plaintiff scored a

22 out of 30 on a mini-mental state examination which indicated "true cognitive impairment," including difficulty with orientation, attention/calculation, and memory recall.  Tr. 356.  Rivera also noted that plaintiff verbalized no suicidal thoughts.  Tr. 355.

Moore's July 20, 2007 GAF score of 35 is based on a two-page narrative report.  According to the DSM-IV, this score reflects either some impairment in reality testing or communication or major impairment in several areas such as work, school, family relationships, judgment, thinking, or mood.  DSM-IV at p. 34. Moore's report included no references to an impairment in reality testing or communication but, Moore did note plaintiff's difficulty with memory loss which impaired her ability to keep appointments and take medication.  Tr. 449-50.  Additionally, Moore noted that although plaintiff had had the benefit of a skills trainer and individual therapy, the services had been discontinued because of plaintiff's inability to retain information and missing appointments.  Id.  Like the other practitioners, Moore also noted that plaintiff had not expressed any suicide/homicide ideation.

The narratives accompanying the GAF scores are capable of supporting a conclusion that the scores reflect each clinician's assessment of plaintiff's functioning.  Even if they reflected each clinician's judgment of symptom severity rather than of functional limitations, they nonetheless undermine the ALJ's conclusion that plaintiff's impairments had not worsened over time.  Both Dr. Villanueva and PA Swindells opined that plaintiff would improve from her traumatic brain injury sustained in her fall.  No practitioner explains how, despite these opinions, plaintiff has received evaluations by other practitioners which suggest a

52 - FINDINGS & RECOMMENDATION

deterioration of her brain functioning from this injury. While the record does not support the ALJ's conclusion, there remains an absence of explanation for the unexpected result. Finding an answer to this question may warrant some attention by the ALJ on remand.

Finally, Dr. Rawlins's nine-page report, which the ALJ did not have the opportunity to consider, has a GAF score of 40. I agree with plaintiff that it is appropriate for this Court to consider Dr. Rawlins's report. As in noted in Harman v. Apfel, 211 F.3d 1172, 1180 (9th Cir. 2000), the court may properly consider additional materials submitted to the Appeals Council when the Appeals Council has addressed them in the context of denying the claimant's request for review. See also Ramirez v. Shalala, 8 F.3d 1449, 1451-52 (9th Cir. 1993) (it is appropriate to consider on appeal both the ALJ's decision and additional material submitted to the Appeals Council, when the Appeals Council concludes that the ALJ's decision was proper and that the additional material failed to provide a basis for changing the hearing decision).

I also agree with plaintiff that the Appeals Council erred in concluding that Dr. Rawlins's report did not provide a basis for changing the ALJ's decision. The Appeals Council found that Dr. Rawlins's report was "not consistent with other substantial opinion evidence of record that supports the Administrative Law Judge's findings." Tr. 2. Contrary to the Appeals Council's findings, the evidence in the record shows that, even without consideration of Dr. Rawlins's report, plaintiff's condition was observed to have deteriorated after Dr. Villanueva's evaluation. Thus, Dr. Rawlins's report is actually consistent with those observations in

1  the record.

2      The Appeals Council further explained that "evidence contrary

3  to Dr. Rawlins' report is longitudinal and provides a reliable

4  basis upon which the Administrative Law Judge could support his

5  findings." Id. Although it is unclear what evidence the Appeals

6  Council refers to here, my review of the record, as discussed

7  herein, shows that the basis for the ALJ's finding that plaintiff's

8  condition has not deteriorated since Dr. Villanueva's evaluation,

9  is not sufficiently developed in the record.

10     Dr. Rawlins, as detailed more thoroughly above, administered

11 several neuropsychological tests and reviewed several prior

12 assessments by various mental health practitioners, including Dr.

13 Greene's March 2006 neuropsychological evaluation. Tr. 22-29. He

14 expressly noted that plaintiff's IQ scores were significantly lower

15 than they were in 2006 and that it was probable that her brain

16 functioning was deteriorating over time. Tr. 27. He noted her

17 poor performance on several tests, including some results which put

18 her in the retarded range. Tr. 27-28. He stated that it was

19 doubtful that plaintiff could live without assistance, and that she

20 had marked impairment in her activities of daily living. Tr. 29.

21 He also stated that she would not be able to perform work

22 activities on a consistent basis, with or without special

23 supervision and that she would be incapable of maintaining regular

24 attendance in a work place, or completing a normal workday without

25 interruptions from a psychiatric condition. Id.

26     Dr. Rawlins again stated that plaintiff's functioning had

27 deteriorated significantly since 2006, presumably due to the slow

28 progression of  brain damage, and that her functioning would

54 - FINDINGS & RECOMMENDATION

possibly continue to deteriorate. Finally, his assessment of a GAF score of 40, while higher by five points that Moore's July 2007 GAF score of 35, is still in the same ten-point range as Moore's, indicating major impairment in several areas. When Rawlins's comments and conclusions are considered, it is clear that plaintiff's condition has deteriorated over time. See Young v. Heckler, 803 F.2d 963, 968 (9th Cir. 1986) (where claimant's condition is progressively deteriorating, most recent medical report is most probative).

The ALJ's reasons for concluding that evidence establishes that plaintiff did not meet two Paragraph B criteria of Listing 12.02 is not adequately supported in the record. Dr. Greene's report is ambiguous and thus, the meaning of the ALJ's "acceptance" of her report is unclear.[8] Additionally, the ALJ misread the record when he stated that the evidence did not demonstrate that plaintiff's impairments had worsened. The ALJ also failed to properly assess the weight to be given to the various GAF scores, none of which, as seen by this Court, are between 55 and 60 as the ALJ reported.

I do not share, however, plaintiff's position that the record before the ALJ conclusively establishes that plaintiff meets the requisite criteria for Listing 12.02. First, there is no finding

---

[8] Upon remand, the ALJ should consider recontacting Dr. Greene to obtain clarification of her report. See Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005) (ALJ required to recontact a doctor if the doctor's report is ambiguous or insufficient for the ALJ to make a disability determination).

55 - FINDINGS & RECOMMENDATION

1  by the ALJ as to Paragraph A of the listing.[9]  Second, given the
2  ambiguity in Dr. Greene's report, I cannot say that it establishes
3  a  listed  disability.    Third,  the  ALJ  should  be  given  the
4  opportunity  to  evaluate  Dr.  Rawlins's  report.    Thus,  while  I
5  recommend that the ALJ's decision be reversed, I do not find it
6  appropriate to remand for a determination of benefits but rather,
7  I remand for additional proceedings.

8  III.  Plaintiff's Testimony

9       The ALJ is responsible for determining credibility.  <u>Andrews</u>
10 <u>v. Shalala</u>, 53 F.3d 1035, 1043 (9th Cir. 1995).  Once a claimant
11 shows an underlying impairment and a causal relationship between
12 the impairment and some level of symptoms, clear and convincing
13 reasons are needed to reject a claimant's testimony if there is no
14 evidence of malingering.  <u>Smolen v. Chater</u>, 80 F.3d 1273, 1281-82
15 (9th Cir. 1996).  When determining the credibility of a plaintiff's
16 complaints  of  pain  or  other  limitations,  the  ALJ  may  properly
17 consider  several  factors,  including  the  plaintiff's  daily
18 activities, inconsistencies in testimony, effectiveness or adverse
19 side  effects  of  any  pain  medication,  and  relevant  character
20 evidence.  <u>Orteza v. Shalala</u>, 50 F.3d 748, 750 (9th Cir. 1995).
21 The ALJ may also consider the ability to perform household chores,
22 the lack of any side effects from prescribed medications, and the
23 unexplained absence of treatment for excessive pain.  <u>Id.</u>

24      As  discussed  in  the  previous  section,  the  ALJ  described
25 plaintiff's  lay  testimony,  noted  the  letter  from  her  former

26
27      [9]  Plaintiff argues that Dr. Greene's report supports a
28 determination that the Paragraph A criteria are met.  This is
   more appropriate for the ALJ to consider in the first instance.

56 - FINDINGS & RECOMMENDATION

employer, and then discussed evidence from her brother and her father.  Tr. 16-17.  Following this, the ALJ addressed that evidence collectively, by explaining, as quoted above at page 41, that while plaintiff's impairments could be expected to cause symptoms and limitations that reduced her functioning, the objective evidence showed she retained the RFC to perform other work in the national economy.  Tr. 17.  "Therefore," the ALJ stated, while he found "the statements made by the claimant and third parties concerning the intensity, persistence, and limiting effects of her symptoms" to be "generally credible," the ALJ, "in light of the medical evidence discussed below," gave the statements "less weight to the extent they are inconsistent with the [RFC]."

Following this, the ALJ then discussed Dr. Greene's assessment, as discussed in detail above, concluding that the evidence did not demonstrate that plaintiff's impairments had worsened. Tr. 18. He then found plaintiff's symptom testimony not credible based on what he described as a failure of plaintiff to maintain regular mental health treatment, despite receiving multiple recommendations to do so. Id. He also found her lacking credibility in regard to headaches because while the record showed she experienced recurrent headaches, the treatment notes were not clear as to the nature of her symptoms and the record did not indicate that her symptoms were as frequent and intense as she claimed. Id. While the treatment notes documented plaintiff's reports, they did not reflect treatment for frequent migraine symptoms or indicate that plaintiff had required regular adjustments of medication. Tr. 19. And, upon evaluation and medication by Dr. Chua, plaintiff reported decreased symptoms and

57 - FINDINGS & RECOMMENDATION

1  frequency of her headaches at the next appointment.  Id.

2      The ALJ also noted that despite plaintiff's reported history
3  of kidney stones, testing was negative for recurrent stones.  Id.
4  Additionally, the ALJ cited to the occasion when plaintiff reported
5  to PA Swindells that she had a positive CT scan for kidney stones
6  and she was undergoing treatment to pass them, but this was
7  contradicted by the hospital records.  Id.

8      Plaintiff argues that the ALJ erred in his discussions of
9  plaintiff's headaches and the frequency of her mental health
10  treatment.  Plaintiff notes that she received frequent treatment
11  for her headache symptoms.  She points to records from Dr.
12  Gilliland remarking, on approximately twenty-four separate
13  occasions, her complaints of headache in 2004 and 2005.  She
14  further notes treatment for headache four times at the emergency
15  department of Three Rivers Hospital, and on other occasions by PA
16  Swindells and the Siskiyou Community Health Center.

17      Dr. Gilliland's treatment of plaintiff concluded on January
18  27, 2005, about two and one-half to three months before plaintiff's
19  alleged onset date.  Thus, they are entitled to less weight.  See
20  Carmickle v. Commissioner, 533 F.3d 1155, 1165 (9th Cir. 2008) (ALJ
21  did not err in according less weight to opinion of medical
22  practitioner which predated the alleged onset of disability because
23  such opinions are of "limited relevance"); Burkhart v. Bowen, 856
24  F.2d 1335, 1340 n.1 (9th Cir. 1988) (ALJ correctly rejected medical
25  evidence because it predated the relevant time period).

26      According to my review of the record, as well as the evidence
27  cited by plaintiff in her memorandum, Pltf's Op. Brief at p. 18,
28  plaintiff complained of headache to PA Swindells only on one

58 - FINDINGS & RECOMMENDATION

occasion - November 21, 2005, and complained to another practitioner at Siskiyou Community Health Center on a date in September or October 2006. Tr. 332, 494.[10] This latter chart note indicates that a brain CT scan was ordered. Tr. 494. Additionally, there is a reference in another chart note from Siskiyou Community Health Center to her suffering from chronic daily headaches, even though that was not apparently a complaint for which she sought care at that time. Tr. 490.[11] At that time, it was noted that she took Depakote, which she reported had caused a ten-pound weight gain. Id. Even though, as noted immediately below, plaintiff had stated only a few months earlier that Depakote had improved her headache pain, she reported at this visit that she was receiving no improvement from it. Id. She was given nortriptyline, an antidepressent, instead. Id.

As to the emergency department records, they reveal that on August 3, 2006, plaintiff presented to the Three Rivers Community Hospital emergency department, complaining of vertigo and headache. Tr. 420. Notably, however, while she reported a history of chronic headaches, she stated that Depakote, which PA Swindells had prescribed in November 2005, had helped with her headaches, that she had stopped taking it because she could not afford it, but that

[10]   Page 494 of the Administrative Record shows plaintiff's complaint of headache but the date of her visit and examination is unclear. From the entries both before and after that visit, it appears to have occurred somewhere between September 25, 2006, and October 5, 2006. Tr. 493-94.

[11]   The date of this visit is also unclear from the record but appears to between the prior entry dated November 17, 2006, and the following entry dated January 4, 2007. Tr. 489-495.

59 - FINDINGS & RECOMMENDATION

1  she was back on a health plan that would possibly pay for it again.

2  Id.  The record cited by plaintiff at page 373 is not an actual

3  emergency department visit, but is a record of an October 6, 2006

4  head CT scan with the notation that the clinical history was

5  "headaches."  Tr. 373.  Another copy of this record is also found

6  at page 498 and indicates that the ordering physician was Dr.

7  Beachy, who, from other records cited above, is noted to be a

8  physician with Siskiyou Community Health Center.  The logical

9  assumption is that this is a record of the brain CT scan ordered by

10  the unknown practitioner at the Health Center in late September or

11  early October 2006.  The scan was normal.  Tr. 373, 498.

12       The next emergency department visit cited by plaintiff

13  occurred on February 3, 2007, where her chief complaint is noted as

14  a headache.  Tr. 405.  Finally, the last record cited by plaintiff

15  on this issue is a November 10, 2007 emergency department visit

16  where plaintiff's chief complaint is a cough.  Tr. 388.  She does

17  complain that the cough increased her headache pain.  Id.

18       Dr. Chua's March 20, 2007 record describes plaintiff's

19  complaint of horrible headaches, but, his April 20, 2007 notes that

20  her severe headaches had decreased in intensity and frequency on

21  Topamax, 100 milligrams, four times per day.  Tr. 381.  She did

22  report continued "pressure headaches," but also noted a decrease in

23  the frequency of her vertigo to once to twice weekly, instead of

24  daily, and lasting only five to thirty seconds, instead of three to

25  five minutes.  Id.[12]  In a report to PA Swindells from Dr. Chua on

26  _____

27       [12]  Plaintiff's description of the April 20, 2007 record as
    reflecting Dr. Chua's notation that plaintiff was still having
28  one to two severe headaches per week, even on Topamax, is not an

60 - FINDINGS & RECOMMENDATION

March 20, 2007, Dr. Chua noted that plaintiff had discontinued Depakote due to weight gain.  Tr. 382.

The ALJ, as described above, found plaintiff's headache testimony not credible because the record did not reflect treatment for frequent migraine symptoms or indicate that plaintiff had required regular adjustments of medication.  Tr. 19.  And, upon evaluation and medication by Dr. Chua, plaintiff reported decreased symptoms and frequency of her headaches at the next appointment. Id.

Essentially, the ALJ discredited plaintiff's testimony because it was inconsistent with the amount of treatment she sought and received.  The record supports the ALJ.  If plaintiff's headaches were as subjectively crippling as she stated during the relevant post-onset date time period, one would expect to see her seeking more frequent treatment from her primary care provider, meaning more than once from PA Swindells, and one to two more times from an unnamed practitioner at Siskiyou Community Health Center.  She only had two emergency department visits related to this condition.

Additionally, she initially reported that Depakote relieved her symptoms, then said it did not while simultaneously complaining of weight gain.  Dr. Chua's note indicates that the Depakote was discontinued not because it was ineffective, but because of weight gain.  And, as explained above, Dr. Chua's note reflects improvement on Topamax.  Overall, the record is consistent with the ALJ's finding.

_____

accurate reading of that record.  Tr. 381.  The chart note clearly shows that the reference to one to two per week was limited to her episodes of vertigo, not severe headache.  Id.

61 - FINDINGS & RECOMMENDATION

1    As to the mental health treatment, the parties appear to agree

2    that putting aside assessments and treatment plan meetings,

3    plaintiff attended eleven counseling sessions in fifteen months.

4    Deft's Brief at p. 17; Pltf's Reply Brief at p. 9.   Plaintiff

5    contends that the level of mental health treatment was extensive

6    and ongoing and thus, the ALJ erred in concluding that she had not

7    maintained regular mental health treatment as recommended.

8    Defendant contends that the ALJ is responsible for assessing

9    that this amount of treatment is less than what would be expected

10   from a patient whose doctors were repeatedly recommending such

11   treatment.   I agree with defendant.   The mental health records do

12   not suggest that plaintiff's visits were limited by an inability to

13   pay.   While eleven visits in fifteen months is not a paltry number,

14   it is capable of suggesting that the impairment is not as severe as

15   subjectively described.   As the Ninth Circuit has noted, "[w]hen

16   evidence reasonably supports either confirming or reversing the

17   ALJ's decision, [the court] may not substitute [its] judgment for

18   that of the ALJ." Batson v. Commissioner, 359 F.3d 1190, 1196 (9th

19   Cir. 2004).

20   Additionally, the ALJ noted plaintiff's inconsistent

21   statements to PA Swindells regarding her kidney stones.   As

22   defendant notes, the ALJ may consider such inconsistent statements

23   in assessing credibility.   Tonapteyan v. Halter, 242 F.3d 1144,

24   1147-48 (9th Cir. 2001).

25   Overall, the ALJ's credibility determination is rational and

26   supported by substantial evidence in the record.   The record shows

27   at least one instance of an inconsistent statement to a treatment

28   provider, and two instances (headache and mental health treatment),

62 - FINDINGS & RECOMMENDATION

1    where plaintiff sought far less treatment than would be expected of
2    someone with her level of subjective pain.  See Burch v. Barnhart,
3    400 F.3d 676, 681 (9th Cir. 2005) ("The ALJ is permitted to
4    consider lack of treatment in his credibility determination.").
5    The record also shows that plaintiff was inconsistent in her
6    reports of the effectiveness of Depakote, and that, according to
7    Dr. Chua, her discontinuation of it related to weight gain, not
8    because it failed to relieve her symptoms.  Again, when the
9    "evidence reasonably supports either confirming or reversing the
10   ALJ's decision," the court is not permitted to substitute its
11   judgment for that of the ALJ.  Batson, 359 F.3d at 1196.  The ALJ
12   did not err in finding plaintiff not credible.

13   IV.  Lay Witness Testimony

14       As with plaintiff's testimony, the ALJ found the testimony and
15   written submissions by plaintiff's former employer, brother, and
16   father "generally credible," but nonetheless, he gave them "less
17   weight" to the extent they were inconsistent with the RFC because
18   the medical evidence did not support the extent of symptoms and
19   limitations described by the third parties.

20       An ALJ must give reasons "germane to the witness" when
21   discounting the testimony of lay witnesses.  Valentine v.
22   Commissioner, 574 F.3d 685, 694 (9th Cir. 2009).  "One reason for
23   which an ALJ may discount lay testimony is that it conflicts with
24   medical evidence."  Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir.
25   2001).  The ALJ did not err in rejecting the lay witness testimony.

26   V.  VE Hypothetical

27       Plaintiff argues that the hypothetical presented to the VE was
28   invalid because it failed to include plaintiff's subjective symptom

63 - FINDINGS & RECOMMENDATION

testimony, the testimony of the three lay witnesses, the limitations described by plaintiff's treating mental health practitioners, and repeated absences plaintiff would likely have due to her severe, recurring headaches.

I agree with plaintiff that, because of the problems with the consideration of Dr. Greene's report, and the fact that the ALJ has yet to consider Dr. Rawlins's report, the hypothetical presented to the VE may have been invalid. An incomplete hypothetical cannot "constitute competent evidence to support a finding that claimant could do the jobs set forth by the vocational expert." Nguyen v. Chater, 100 F.3d 1462, 1466 n.3 (9th Cir. 1996).

CONCLUSION

The Commissioner's decision should be reversed and remanded for additional proceedings.

SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due August 6, 2010. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due August 23, 2010. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

IT IS SO ORDERED.

Dated this  19th  day of  July      , 2010.


     /s/ Dennis James Hubel
Dennis James Hubel
United States Magistrate Judge

64 - FINDINGS & RECOMMENDATION